B. D. C. CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION, Respondent: ARMORED CARRIER CORPORATION and others, Impleaded Respondents.

*February 6—March 31, 1964.*

264

266

272

For the appellant there were briefs by *Honeck, Mantyh & Arndt* of Milwaukee, attorneys, and *Axelrod, Goodman & Steiner* of Chicago, Illinois, of counsel, and oral argument by *Stewart G. Honeck* and *David Axelrod.*

For the respondent Public Service Commission the cause was argued by *William E. Torkelson,* chief counsel, with whom on the brief was *George Thompson,* attorney general.

For the impleaded respondent Armored Carrier Corporation there was a brief by *Jasper, Winner, Perina & Rouse* of Madison, and oral argument by *Claude J. Jasper.*

For the impleaded respondents Wisconsin Motor Carriers Association and its members there was a brief and oral argument by *John L. Bruemmer* of Madison.

For the other impleaded respondents there was a brief by *Kaumheimer, Reinhart, Boerner, Van Deuren & Norris*, attorneys, and *Richard H. Norris III* of counsel, all of Milwaukee, for the Marine National Exchange Bank of Milwaukee, and by *Grootemaat, Cook & Franke*, attorneys, and *Harry F. Franke* and *John J. Ottusch* of counsel, all of Milwaukee, for the Marshall & Ilsley Bank.

WILKIE, J.    A single issue is raised on this appeal.

*In a declaratory-relief proceeding before the Public Service Commission to determine the scope of a motor carrier license issued after a hearing, does the failure of the commission, under the circumstances of this case, to give consideration to the record of the original hearing and to the record of a subsequent hearing held in relation to the license, constitute an abuse of discretion requiring a remand of the proceedings to the commission with directions to take the hearing records into consideration in interpreting the subject license?*

BDC asserts the right, under its present license, to carry items from First Wisconsin to the 54 correspondent banks listed in Exhibit 5, and to carry items from each of the latter to First Wisconsin. It is conceded that the license authorizes such carriage on a contract basis, in both directions, provided First Wisconsin is the shipper and pays the charges. The question is whether the certificate, properly construed, authorizes the carriage inbound if the charges are in fact paid by the correspondent bank sending the particular item.

The problem arises because it appears that it may be improper under banking regulations for the charges for carriage of items inbound to the First Wisconsin to be paid by it. On the other hand, if payment of the charges for such carriage by the outlying banks prevents BDC from performing

such service, the license is thus made into something of an absurdity, as a practical matter.

The commission took the position that the use of the word "for" in the license required the narrow construction. The commission's interpretation of the term is doubtless entitled to considerable weight in these matters. We conclude, however, that it was error for the commission to reach its interpretation without considering the entire record.

To evaluate the claim of procedural error, we must first determine the legal distinctions between private and public contract carriers. Sec. 194.34 (1), Stats., provides in part:

"CONTRACT MOTOR CARRIERS; LICENSE; APPLICATION AND HEARING; DISCRIMINATION. (1) No person shall operate a motor vehicle upon the public highways as a contract motor carrier without first having obtained from the commission a license and a permit for the operation of such vehicle. *The commission, upon the filing of an application for such license, shall have power as the public interest may require, upon a finding of public convenience and necessity as to service to be performed for the public generally or any (well defined) class thereof, and of convenience and necessity as to other contract motor carrier services,* to grant or deny the license prayed for . . ." (Emphasis added.)

This provision marks out clear distinctions between two classes of contract carriers. A private contract carrier, serving a determinate number of shippers, must demonstrate that his service is in the "public interest," [1] and in the "con-

[1] "194.02 LEGISLATIVE INTENT. It is hereby declared to be the purpose and policy of the legislature in enacting chapter 194 to confer upon the motor vehicle department and the public service commission the power, authority and duty to supervise and regulate the transportation of persons and property by motor vehicles upon or over the public highways of this state in all matters, whether specifically mentioned herein or not, so as to protect the safety and welfare of the traveling and shipping public in their use of the

venience and necessity" of the shipper and receiver *alone*. A public contract carrier is a specialized hauler serving the general public "or any (well defined) class thereof," but not between fixed termini or over a regular route (the salient characteristics of a common motor carrier). The public contract carrier must, therefore, demonstrate as a condition of receiving a license that his service is in the public interest and serves the *"public* convenience and necessity," in addition to the convenience of a particular shipper and his receivers. Sec. 194.34 (1), Stats. 1961, was enacted by ch. 290, Laws of 1945. The present statutory language is a legislative overruling of *United Parcel Service v. Public Service Comm.*[2] wherein this court held that sec. 194.34 (1) did not permit distinctions between public contract carriers and private contract carriers under statutory language authorizing the issuance of licenses "as the public interest may require, upon a finding of convenience and necessity."[3]

The instant proceeding was conducted before the commission pursuant to sec. 227.06, Stats. It has been noted:

"A good deal of harm stems from a widespread misconception that a declaratory judgment or a declaratory order relates to abstract or remote questions and that other judgments and orders relate to concrete controversies. This idea

highways; to relieve the existing and all future undue burdens on the highways arising by reason of the use of the highways by motor vehicles; to carefully preserve, foster and regulate transportation to the end of developing and preserving each separate type of the transportation system by highway and rail adequate to meet public needs." See also sec. 194.18 (5), (9), Stats.

Further note *Motor Transport Co. v. Public Service Comm.* (1953), 263 Wis. 31, 38, 56 N. W. (2d) 548: "The foregoing statutory provisions [sec. 194.23] make it clear that the paramount goal sought to be attained by the regulation of motor carriers thereby authorized is that of providing adequate motor-transportation service to meet the public needs, and any other objective is secondary."

[2] (1942), 240 Wis. 603, 4 N. W. (2d) 138.

[3] Ch. 288, Laws of 1937.

is wholly erroneous. The only difference between declaratory orders or judgments and other orders and judgments is presence or absence of the element of coercion." [4]

A declaratory order construing the scope of a prior license has the same impact as the original order issuing the license, upon a carrier's interests. Therefore, both the commission and this court must take care to see that the carrier has received a "fair hearing" in compliance with the spirit, as well as the letter, of the Administrative Procedure Act (ch. 227, Stats.).

The commission contends that in determining the scope of a prior order in the context of a subsequent declaratory proceeding in relation to that order, the commissioners need only look to the findings of fact, conclusions of law, and content of the prior order. The commission need not consider the evidentiary record underlying the prior determinations in resolving a concrete controversy as to the scope of the prior order. The commission relies upon *Northwestern Wisconsin Electric Co. v. Public Service Comm.*[5] However, in that case the court, taking note of certain factors outside the content of the order and findings, construed the term "final judgment" used in the PSC order in a manner different from the commission's view and thus reversed the commission's construction of the meaning of a prior order.

"Thus, it is evident that the term 'final judgment' can be taken in the sense which conforms with the general purpose of the order and the evident intent of the commission as we have found it. We are not disturbed because the commission construed the language of the order otherwise. In the first place, there was a change in the personnel of the commission; in the second place, the problem of construing the order is one for the court and subjective tests are no more applicable

[4] 1 Davis, Administrative Law Treatise (1958), p. 268, sec. 4.10.
[5] (1946), 248 Wis. 479, 22 N. W. (2d) 472.

to orders of the commission than to private contracts of individuals." [6]

The PSC argues that because, in 1957, it found "[t]he proposed operations of the applicant to serve the First National Bank of Kenosha and the First Wisconsin National Bank of Milwaukee as set forth above *are in the public interest and required by the convenience and necessity of the named shippers* because there is a reasonable need evident for the service" (the requirements for a private contract carrier) and further found that BDC had requested authority to transport certain items *for the First National Bank of Kenosha,* Kenosha, and certain items between points in Milwaukee county and points in 36 other counties *for First Wisconsin National Bank of Milwaukee,* on its face the 1957 order categorizes BDC as a private contract carrier, shipping only for the clearinghouse banks.

We note that under the label of "finding of fact" the commission concluded that the proposed operations were "in the public interest and required by the convenience and necessity of the named shippers because there is a reasonable need evident for the service." Because the commission found the service to be in the "convenience and necessity" of the shippers and receivers *only,* and did not find the service to be in the *public* "convenience and necessity," arguably, the commission concluded that BDC was a private contract carrier.

This "finding," however, is a conclusion of law. In the context of administration of sec. 194.34, Stats., findings of fact refer to those determinations relating to the nature of the service for which authority is sought, the consumer demand for such service, the volume of traffic in the market into which entry is sought, the impact of entry of a new carrier upon costs, and efficiency of transportation, and the

---

[6] *Northwestern Wisconsin Electric Co. v. Public Service Comm., supra,* p. 485.

impact of new entry upon the market position of established carriers.

To these findings the commission must apply standards derived either from express provisions of ch. 194, Stats., or from the purpose of the statute as a whole.[7] The application of such standards to the "facts" as described above will result in a determination as to whether such service is in the "public interest," and whether such carrier ought to be deemed as a common carrier, public contract carrier, or private contract carrier. The application of legislative standards to given "facts" is a determination of law.

It does not follow, however, that this court will independently redetermine every conclusion reached by the commission under sec. 194.34, Stats. As we recently held:

"If it is true that a determination by the commission that there has been misconduct under the standard prescribed by the statute is a conclusion of law, it does not follow that every such determination is open to an independent redetermination by this court. If several rules, or several applications of a rule are equally consistent with the purpose of the statute, the court will accept the agency's formulation and application of the standard.

"However, this court has the power in the first instance to determine whether the standard or policy choice used by the agency is consistent with the purpose of the statute. If upon consideration, we determine that a particular rule is consistent with legislative purpose, we must reject alternative rules regardless of whether they are 'reasonable' or grounded in administrative expertise."[8]

Therefore, if a rule formulated by the PSC is consistent with the basic purpose of the statute, or if the application of

---

[7] *Motor Transport Co. v. Public Service Comm., supra.*

[8] *Milwaukee Transformer Co. v. Industrial Comm.* (1964), 22 Wis. (2d) 502, 510, 126 N. W. (2d) 6; *Tecumseh Products Co. v. Wisconsin E. R. Board,* ante, p. 118, 126 N. W. (2d) 520.

a prior rule in a given case is also consistent with the basic statutory purpose, this court will sustain the commission's determination, even though an alternative rule or application may be equally consistent with the statutory purpose.

However, assuming that there is no conflict between the findings, conclusions of law, and the order, we conclude that the commission must look to the record if a party contends that the content of the record renders the content of the order ambiguous. The general rule that an order, clear on its face, may not be interpreted in the light of extrinsic evidence is a rule appropriate for *judicial proceedings*. However, the distinctive feature of an administrative agency such as the PSC is its presumed ability to render judgment upon detailed, complex, technical *factual* matters.[9] A court must rely upon documents, regular on their face, in subsequent proceedings in order to limit deliberations and release the court for consideration of a multitude of varying problems of the general law. An agency has the more-limited responsibility of administering a specific statute in light of its *"factual"* expertise. Because a declaratory proceeding has the same magnitude of effect upon an affected carrier's interest as the original hearing, the PSC must give full consideration to all factual data surrounding the nature of the service, regardless of whether such data was received prior to the original order. Judgment predicated upon expert evaluation of technical facts is the power the legislature conferred upon the commission. The commission may not decline to exercise this power at its own discretion.

The issue present in this appeal was squarely presented to the United States supreme court in *Securities Comm. v. Chenery Corp.*[10] As an exercise of its power to administer

---

[9] "This court recognizes that the Public Service Commission possesses wide experience and much *technical knowledge* in the field of regulation of motor-carrier transportation of property." (Emphasis added.) *Motor Transport Co. v. Public Service Comm., supra,* p. 43.

[10] (1943), 318 U. S. 80, 63 Sup. Ct. 454, 87 L. Ed. 626.

the Public Utility Holding Company Act, the commission issued an order requiring managers who purchased their corporation's stock during a reorganization, to divest themselves of these holdings on the rationale that such insider trading violated settled *judicial doctrines* of "fair dealing."

The court remanded the matter to the commission for reconsideration in light of "its experience and peculiar competence."

"Whether and to what extent directors or officers should be prohibited from buying or selling stock of the corporation during its reorganization, presents problems of policy for the judgment of Congress or of the body to which it has delegated power to deal with the matter." (318 U. S. at p. 92.)

"For the courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review . . . 'The administrative process will best be vindicated by clarity in its exercise.' *Phelps Dodge Corp. v. Labor Board,* 313 U. S. 177, 197. What was said in that case is equally applicable here: 'We do not intend to enter the province that belongs to the Board, nor do we do so. All we ask of the Board is to give clear indication that it has exercised the discretion with which Congress has empowered it." (318 U. S. at p. 94.) [11]

Moreover, a recent United States supreme court case addresses itself to problems under the Federal Motor Carrier Act, which are directly relevant to the case at bar. In *Burlington Truck Lines, Inc., v. United States,* [12] a small carrier, Nebraska Short Line Carriers, Inc., serving eastern and central Nebraska, interchanged traffic with larger trunk-line carriers with whom through-route joint-rate interline ar-

---

[11] On remand, the commission's order compelling the divestiture was reinstated supported by a rationale grounded on the economic realities of the impact of the reorganization upon stock values. The court sustained the order. *Securities Comm. v. Chenery Corp.* (1947), 332 U. S. 194, 67 Sup. Ct. 1575, 91 L. Ed. 1995.

[12] (1962), 371 U. S. 156, 83 Sup. Ct. 239, 9 L. Ed. (2d) 207.

rangements had been established. Short Line Carriers, Inc., resisted organizational attempts by the Teamsters Union, and maintained an open shop. The Teamsters, however, were the bargaining representative for the trunk-line carriers who transported Short Line's shipments to ultimate receivers. The union threatened the trunk-line carriers with a secondary boycott pursuant to "hot cargo" provisions in their collective agreement. Many trunk-line carriers refused to carry Short Line's shipments. Some through carriers, Burlington Truck Lines specifically, ignored union demands, continued to carry Short Line's shipments and were not subjected to boycott. Short Lines petitioned the Interstate Commerce Commission seeking authority to expand their routes so as to be able to ship directly to their ultimate receivers or alternatively, to obtain from the ICC a cease-and-desist order directing the trunk lines to handle their shipments regardless of potential labor trouble.

Finding that service to Short Line's receivers was impaired, and finding that the existing carriers failed in their public duties by conforming to union demands, which would not be likely to end in reprisal, the commission granted the application for expansion of existing services. Burlington, as an affected existing carrier, appealed.

The United States supreme court set aside the board order and remanded the matter for further proceedings, holding:

"There are no findings and no analysis here to justify the choice made [between a cease and desist order, and an order expanding service] no indication of the basis on which the commission exercised its expert discretion. . . . Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, *expertise,* the strength of modern government can become a monster which rules with no practical limits on its discretion.' *New York v. United States,* 342 U. S. 882, 884 (dissenting opinion). . . . The commission must exercise its discretion . . . within the

bounds expressed by the standard of 'public convenience and necessity.' . . . And for the courts to determine whether the agency *has* done so, it must 'disclose the basis of its order' . . . Here the commission made no findings specifically directed to the choice between two vastly different remedies with vastly different consequences to the carriers and the public. Nor did it articulate any rational connection between the facts found and the choice made." [13]

All members of the court agree that the commission must consider the evidentiary record in resolving ambiguity in the relationship between the content of the 1957 order and the findings of fact and the conclusions of law therein.

A majority of members of this court believes that upon remand, and upon consideration of the evidentiary record of the 1957 hearing, and those portions of the June, 1962, hearing which relate to practice under the license, the commission may come to one of two possible conclusions. (1) BDC is a private contract carrier shipping only for the clearinghouse banks, or (2) BDC is a private contract carrier shipping for both the clearinghouse banks and the correspondent banks.

A majority of the members of this court notes that BDC's Exhibit 5 (offered at the 1957 hearing), contained a list of the names and addresses of 54 correspondent banks of the First Wisconsin National Bank of Milwaukee which BDC sought to service under the then pending application filed with the PSC. The majority concludes that if carrier charges for the instruments to be transported by BDC from these 54 banks to First Wisconsin National Bank of Milwaukee are paid by these banks as consignors, and not by the consignee, First Wisconsin National Bank of Milwaukee, BDC would not thereby be converted from a private contract carrier into

---

[13] 371 U. S. at p. 167. See also *Schaffer Transportation Co. v. United States* (1957), 355 U. S. 83, 78 Sup. Ct. 173, 2 L. Ed. (2d) 117, wherein the court remanded ICC denial of license for reconsideration in light of conflict between findings of fact and conclusions of law when no basis of decision was articulated.

a public contract carrier; that merely because a private contract carrier is to transport for 54 specified contracting consignor parties instead of a few, should not convert the status of such a carrier into that of a public contract carrier.

Thus a majority of the court determines that there is no legal impediment to the commission so construing the license as to allow the 54 correspondent banks to pay the transportation charges on in-bound items carried from these banks to First Wisconsin. For reasons stated above this would not convert BDC from a private contract carrier to a public contract carrier.

The writer of this opinion cannot agree with this conclusion. The evidentiary record shows that BDC's services are beneficial to both correspondent banks and clearinghouse banks. Moreover, the record reveals that BDC made application to extend its service to 54 banks. Arguably, this section of the banking industry represents a well-defined class of the public within the meaning of sec. 194.34 (1), Stats. Although the ultimate meaning of "well-defined class" of the public is a legal conclusion, the commission has the power in the first instance to give this phrase meaning and the court must accept the commission's view if it is reasonably consistent with the statutory objectives of ch. 194, Stats. Moreover, the determination of the meaning of this phrase involves evaluations of technical factual matters relating to transportation economics. The license involves some 56 banks. The manner in which such banks pass on transportation costs to the customers could well affect the economic position of large numbers of people outside of the banking interests. Surely, the manner in which transportation costs are distributed by the affected banks is a matter within the "technical knowledge" of the commission.[14] The writer is

---

[14] *Motor Transport Co. v. Public Service Comm., supra.*

convinced that the commission could reasonably find that in light of the number of banks involved in BDC service, and in light of the probable impact of the cost of this service upon the banks' customers, the 1957 license conferred public contract carrier status on the appellant. The commission could conclude that the term "public" was inadvertently omitted from the finding of "convenience and necessity" with as much ease on this record as it could conclude that the finding of transporting *for* the First Wisconsin National Bank of Milwaukee, and *for* the First National Bank of Kenosha, meant shipping for *all* the banks involved, as the majority would permit.

*By the Court.*—Judgment reversed, and cause remanded for further proceedings not inconsistent with this opinion.