HIXON, Appellant, v. PUBLIC SERVICE COMMISSION, Respondent.*

*September 6—November 29, 1966.*

---

* Motion for rehearing denied, without costs, on January 31, 1967.

For the appellant there were briefs by *Whyte, Hirschboeck, Minahan, Harding & Harland,* attorneys, and *Don S. Peterson* of counsel, all of Milwaukee, and oral argument by *Mr. Peterson.*

For the respondent the cause was argued by *William E. Torkelson,* chief counsel of the Public Service Commission, with whom on the brief was *Bronson C. La Follette,* attorney general.

A brief *amicus curiae* was filed by *A. D. Sutherland* of Fond du Lac, for the Wisconsin Division of the Izaak Walton League of America.

WILKIE, J. The appellant, seeking a ch. 227, Stats., judicial review, contends that respondent's order and findings of fact are insufficient as a matter of law, that they are unsupported by substantial evidence in view of the entire record, and that they are arbitrary and capricious.

The trial court concluded otherwise. We affirm the trial court. A summary of our position is as follows:

(1) The PSC function of issuing or denying a permit for structures and deposits in navigable waters under authority of sec. 30.12 (2) (a), Stats., is legislative.

(2) The instant application of the appellant for such a permit and the processing thereof by the PSC presents a contested case within the meaning of sec. 227.01 (2), Stats.

(3) The fair-play provisions of ch. 227, Stats., are applicable to the instant PSC proceedings. Specifically, the PSC findings are subject to the requirements of sec. 227.13 and to judicial review.

(4) Nevertheless, the PSC findings conform to the requirements of sec. 227.13, Stats., and are supported by "substantial evidence in view of the entire record" [3]

[3] *Milwaukee & Suburban Transport Corp. v. Public Service Comm.* (1961), 13 Wis. (2d) 384, 389, 108 N. W. (2d) 729.

(sec. 227.20 (1) (d)) from which "reasonable minds could arrive at the same conclusion reached by the commission." [4]

(5) In denying the permit, the PSC did not act arbitrarily or capriciously.

*Legislative History of Sec. 30.12 (2) (a), Stats.*

To determine the legal issues raised by this controversy it is first necessary to describe the context in which the PSC considered the permit application by the appellant. This necessitates reviewing the legislative history of the applicable statute.

Sec. 30.02 (1) (b), Stats. (now part of sec. 30.12) was inserted in the statutes by the 1933 legislature providing that:

"(b) It shall be unlawful to deposit any material or to place any structures upon the bed of any navigable water where no shore line has been established or beyond such shore line where the same has been established." [5]

The common law of Wisconsin was to the same effect. [6]

In 1949, the legislature first provided for the issuance of permits to build structures on the beds of navigable waters. In that year, pursuant to ch. 335 of the Session Laws of 1949, sec. 30.02 (1) (b) was amended to read as follows:

"30.02 (1) (b) It shall be unlawful to deposit any material or to place any structures upon the bed of any navigable water where no shore line has been established

---

[4] *Ashwaubenon v. State Highway Comm.* (1962), 17 Wis. (2d) 120, 131, 115 N. W. (2d) 498 (hereinafter *Ashwaubenon, first); Weyauwega Telephone Co. v. Public Service Comm.* (1961), 14 Wis. (2d) 536, 556, 111 N. W. (2d) 559; *Borden Co. v. McDowell* (1959), 8 Wis. (2d) 246, 258, 99 N. W. (2d) 146.

[5] Ch. 455, sec. 2, Laws of 1933.

[6] *Diedrich v. Northwestern Union R. Co.* (1877), 42 Wis. 248, 266.

or beyond such shore line where the same has been established, *provided however, that the public service commission may grant to any riparian owner the right to build a structure, or to maintain a structure already built and now existing, for his own use, if the same does not materially obstruct navigation. Upon complaint by any person, the public service commission shall hold a hearing thereon to determine whether or not such present structure, or one proposed to be built, does materially obstruct navigation."*

That section was again changed by ch. 712 of the Session Laws of 1951 to read as follows:

"30.02 (1) (b) It shall be unlawful to deposit any material or to place any structures upon the bed of any navigable water where no shore line has been established or beyond such shore line where the same has been established, provided, however, that the public service commission may grant to any riparian owner the right to build a structure, or to maintain a structure already built and now existing, for his own use, if the same does not materially obstruct navigation, *or reduce the effective flood flow capacity of the stream or is not detrimental to the public interest.* Upon complaint by any person, the public service commission shall hold a hearing thereon to determine whether or not such present structure, or one proposed to be built, does materially obstruct navigation, *or reduces the effective flood flow capacity of the stream or is detrimental to the public interest.*"

The law remained unchanged until after the submission of the 1959 report of the Wisconsin Legislative Council, which proposed the replacement of sec. 30.02 (1) (b) by the new sec. 30.12 (2) (a), the statute applicable in this case. The revised language incorporated in ch. 441 of the Laws of 1959 provided as follows under sec. 30.12 (2) (a):

"(2) PERMITS TO PLACE STRUCTURES OR DEPOSITS IN NAVIGABLE WATERS. (a) The public service commission may, upon application and after notice and hearing, grant to any riparian owner a permit to build or maintain for

his own use a structure otherwise prohibited by statute, provided such structure does not materially obstruct navigation or reduce the effective flood flow capacity of a stream and is not detrimental to the public interest."

Accordingly, the statute applicable here provides for the issuance of a permit such as the one sought by the appellant to fill in the bed of Plum lake (a navigable lake). The PSC was granted authority to issue such permits provided the proposed structure did not materially obstruct navigation or reduce the effective flood flow capacity of a stream (not here applicable), and was not detrimental to the public interest.

### PSC Function Legislative.

In the very recent *Ashwaubenon Case*,[7] this court had before it an action by the PSC in rejecting an application by the town of Ashwaubenon and others to establish a requested bulkhead line in the Fox river at Green Bay. The function of the PSC in processing that application under sec. 30.11, Stats., was held by this court to be "legislative."[8] In our opinion, the same conclusion must be reached as to the granting or denying of a permit to build a structure or allow a deposit in a designated area in a navigable water pursuant to sec. 30.12 (2) (a).

While the state of Wisconsin holds the beds of navigable waters in trust for all its citizens,[9] the legislature may authorize limited encroachments upon the beds of such waters where the public interest will be served.[10]

---

[7] *Ashwaubenon v. Public Service Comm.* (1963), 22 Wis. (2d) 38, 125 N. W. (2d) 647, 126 N. W. (2d) 567 (hereinafter *Ashwaubenon, second*).

[8] Id. at page 45.

[9] *Muench v. Public Service Comm.* (1952), 261 Wis. 492, 499, 53 N. W. (2d) 514, 55 N. W. (2d) 40.

[10] *State v. Public Service Comm.* (1957), 275 Wis. 112, 117, 81 N. W. (2d) 71.

Thus, in *State v. Public Service Comm.*[11] a legislative act was upheld which authorized the partial fill of a lake to provide a parking lot and other related public improvements for a swimming beach. In upholding this instance of legislative approval of the limited obstruction of the bottom of a navigable lake the court reviewed the history of the trust doctrine and noted that as to the purpose of the trust, "all public uses of water have from time to time been recognized, including pleasure boating, sailing, fishing, swimming, hunting, skating, and enjoyment of scenic beauty." [12]

In this case the court also noted that "the trust doctrine does not prevent minor alterations of the natural boundaries between water and land." [13] Thus, in *Milwaukee v. State* [14] it was held:

"It is not the law, as we view it, that the State, represented by its legislature, must forever be quiescent in the administration of the trust doctrine, to the extent of leaving the shores of Lake Michigan in all instances in the same condition and contour as they existed prior to the advent of the white civilization in the territorial area of Wisconsin."

In *Ashwaubenon, second,* this court stated:

"Recognizing that the proposed Ashwaubenon bulkhead line constitutes a greater intervention than has previously been approved by earlier decisions of this court in its evaluation of the trust doctrine, we must determine whether the legislature contemplated a thrust to the extent here proposed. . . .

"In our opinion, the fair interpretation of sec. 30.11, Stats. 1959, requires the conclusion that the legislature did in fact authorize the type of invasion of navigable waters which is proposed in this case, subject to the safeguards previously referred to. [Sec. 30.11(2), Stats.,

[11] *Supra,* footnote 10.
[12] Id. at page 118.
[13] Ibid.
[14] (1927), 193 Wis. 423, 451, 214 N. W. 820.

specifying that 'Bulkhead lines shall be established in the public interest and shall conform as nearly as practicable to the existing shores.'] We do not find that the trust doctrine forecloses the legislature from this course. The standards prescribed by the legislature constitute adequate protection to the public and, thus, there is no neglect by the trustee of its responsibilities." [15]

In all of these legislative authorizations of fill or structures on the beds of navigable waters, it was the function of the legislature to weigh all the relevant policy factors including the desire to preserve the natural beauty of our navigable waters, to obtain the fullest public use of such waters, including but not limited to navigation, and to provide for the convenience of riparian owners. Attaching whatever significance it chose to each of these factors it was up to the legislature to decide to what extent the natural shorelines and the beds of navigable water should be altered in a manner that would be consistent with the trust under which the state holds title to the beds. In the end, under sec. 30.12 (2) (a), Stats., the legislature has authorized fill and structures to a limited extent, but only when the two standards are met which the legislature prescribes, to wit, that the proposed deposit or structure is "not a material obstruction to navigation" and is "not detrimental to the public interest." [16]

The job of applying these two standards in each particular situation was delegated to the public service commission.

Thus, in the instant case, the PSC launched an investigation in early 1964 as to whether the appellant had deposited fill illegally on the bed of Plum lake in violation of sec. 30.12 (1) (a), Stats. After a hearing held with

[15] *Ashwaubenon v. Public Service Comm.*, *supra*, footnote 7, at page 50.

[16] *Cf. In re Incorporation of Village of North Milwaukee* (1896), 93 Wis. 616, 67 N. W. 1033.

proper notice and at which the appellant was represented by counsel and had complete freedom to present witnesses, and to confront and cross-examine witnesses called by others, the commission entered findings and an order, dated August 27, 1964, directing the appellant to remove the disputed fill on the bed of Plum lake by December 1, 1964. During these proceedings appellant indicated that he might seek a permit under sec. 30.12 (2) (a), and after an application was submitted on September 11, 1964, by agreement of all concerned the entire record of the proceedings initiated earlier in 1964 by the PSC was incorporated into the record held on appellant's permit application.

In the processing of appellant's application the PSC was discharging a legislative function. Just as the legislature deemed it appropriate to delegate the function to approve individual changes in the state arterial highway system,[17] the designation of controlled-access highways,[18] indeed, the approval of bulkhead lines in navigable streams,[19] so here, under sec. 30.12 (2) (a), Stats., the legislature delegates the function of approving fill or structures on the beds of individual waters. Although the legislature has decided that some deposits and structures may be permitted consistent with its duty as trustee, the PSC was given the specific job of applying the two prescribed standards to every application for a permit.

### Contested Case.

Although the function of granting such a permit is legislative, the particular procedure employed by the PSC in considering and disposing of each application under sec. 30.12 (2) (a), Stats., presents a contested case

---

[17] *Ashwaubenon, first, supra,* footnote 4.

[18] *Nick v. State Highway Comm.* (1961), 13 Wis. (2d) 511, 109 N. W. (2d) 71, 111 N. W. (2d) 95.

[19] *Ashwaubenon, second, supra,* footnote 7.

within the meaning of sec. 227.01. Distinguished from the function of approving or disapproving proposed bulkhead lines where the procedure was held not to constitute a contested case [20] because of the absence of a requirement for a hearing, sec. 30.12 (2) (a) provides for the holding of a public hearing on each application for a permit under that section. Moreover, the procedure determines "the legal rights, duties or privileges of any party [the appellant] to such proceeding" and in the proceeding "the assertion by one party of any such right, duty or privilege is denied or controverted by another party to such proceeding. [The public service commission itself, if no one else.]"

The fact that a contested case is presented means that the fair-play provisions of secs. 227.07 through 227.13 of the State Administrative Procedure Act apply to the proceedings. As pertinent here sec. 227.13,[21] prescribing the requirements as to findings, applies and the findings of the commission and its action are the proper subject of judicial review pursuant to ch. 227.

*Findings in Proper Form and*
*Supported by Substantial Evidence.*

Although neither on rehearing nor in his current court action has appellant challenged the sufficiency of the findings in so many words, he does seek review of the commission's findings and order denying his permit on the grounds that: (1) The commission acted arbitrarily and capriciously in denying his permit, and (2) the findings of fact made by the commission were not supported by substantial evidence in view of the entire record.

---

[20] Id. at page 46.

[21] "227.13 **Decisions.** Every decision of an agency in a contested case shall be in writing accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise and separate statement of the ultimate conclusions upon each contested issue of fact without recital of evidence."

Respondent contends that under secs. 227.20 (1) and 196.405 (2), Stats., appellant may not challenge the sufficiency of the findings on appeal to this court. We disagree.

Sec. 227.20 (1), Stats. 1963, provides:

"The review shall be conducted by the court without a jury and shall be confined to the record, except that in cases of alleged irregularities in procedure before the agency, testimony thereon may be taken in the court. The court may affirm the decision of the agency, or may reverse or modify it if the substantial rights of the appellant have been prejudiced as a result of the administrative findings, inferences, conclusions or decisions being:

"(a) Contrary to constitutional rights or privileges; or

"(b) In excess of the statutory authority or jurisdiction of the agency, or affected by other error of law; or

"(c) Made or promulgated upon unlawful procedure; or

"(d) Unsupported by substantial evidence in view of the entire record as submitted; or

"(e) Arbitrary or capricious."

Sec. 196.405 (2), Stats. 1963, provides in part:

". . . No person or corporation shall in any court urge or rely on any ground not so set forth in said application for rehearing."

Since appellant did not challenge the sufficiency of the findings in precisely these words in his application for rehearing, the statutes, literally construed, would seem to foreclose review of the sufficiency of the findings for the first time in the supreme court.

On the other hand, the appellant states plausible reasons why he should be able to challenge the sufficiency of the findings on this appeal.

First, the appellant did challenge the findings on the ground that they were "arbitrary or capricious," one of the statutory grounds set forth in sec. 227.20 (1), Stats. ("Insufficiency of the findings" is not such a statutory ground.) This court has explicitly said that

one of the prime reasons for the requirement of findings of fact is to prevent arbitrary and capricious action on the part of an administrative agency, and that unless the findings of fact set forth the relevant facts and circumstances determinative of its decision, the order of the agency is arbitrary and unlawful under sec. 227.13.[22]

Second, appellant argues that he did allege in his application for rehearing before the commission and in this action that the order of the commission "is unsupported by substantial evidence" and thereby implicitly questioned the sufficiency of the findings.

We deem the two challenges to the commission's order, namely, that findings of fact are unsupported by substantial evidence in view of the entire record and that they are arbitrary and capricious, are adequate to raise the question of the sufficiency of the findings, both on judicial review in the circuit court and this court.

The findings entered by the commission are supported by substantial evidence in view of the entire record. Only Findings five and seven are challenged. There is abundant evidence to support these detailed findings. Finding five reads as follows:

"5. The area in Plum Lake occupied by the fill was navigable by small boats. The fill is spoil from the adjacent excavation and is an extension of the upland into the lake."

Although there was testimony at both the earlier and later hearings to the effect that motorboats had difficulty crossing the sandbar and that pins would be sheared off in the process when these boats attempted to cross the sandbar with the motor extending below the boat, there was other testimony that the motorboats passed over the bar when their motors were tipped up. There was

---

[22] *Commonwealth Telephone Co. v. Public Service Comm.* (1948), 252 Wis. 481, 32 N. W. (2d) 247; also see *State ex rel. Ball v. McPhee* (1959), 6 Wis. (2d) 190, 94 N. W. (2d) 711.

also evidence that boats without motors could go over the bar, that there was always water over the bar, and that in fact it was several inches deep. Certainly this is ample testimony to support a determination by the commission that the sandbar before the fill was "navigable in fact," which has been the time-honored definition of navigability in this state.[23]

Finding seven reads as follows:

"7. The fill as it exists is an unnecessary obstruction to navigation. It is a material obstruction to navigation. It does not allow for the free flow of water thereunder and is detrimental to the public interest on the navigable water involved."

The first sentence of this finding is undisputed in the record. There is no question but what the fill was constructed from spoil taken from the excavation of the area immediately adjacent to the breakwater, and that rowboats, canoes, and motorboats cannot pass over the fill but have to go around it. It is argued that although the particular structure does obstruct navigation in that very area, overall it permits greater movement in the area immediately surrounding the fill. In other words the dredging and construction operation resulting in the structure is really an aid to navigation. The PSC has the function of determining whether or not there was a material obstruction to navigation at the place where the fill was made and this necessarily means that the obstruction to navigation is greater than any offsetting aid to navigation either in the area adjacent to the fill or in the entire lake. The balancing of these two factors is left to the PSC which is acting under its mandate to protect the beds of navigable waters. There is ample evidence to support the PSC finding in this regard.

There can be no question whatsoever about the further finding that "it does not allow for the free flow of water

[23] Sec. 30.10 (1) and (2), Stats.; *Muench v. Public Service Comm., supra,* footnote 9.

thereunder." As to the commission's finding that the obstruction "is detrimental to the public interest on the navigable water involved" appellant's contention is that the finding is inadequate because it does not state any particular reasons why the commission so determined. We do not think any statement of reasons is required beyond those stated by the commission in its findings. To specify particular reasons why the obstruction "is detrimental to the public interest" would be to require the PSC to state what would amount to legislative or policy reasons for its decision. The legislative job was done at the time the standards were set for the approval of permits by the PSC. Any criticism of the PSC because it did not file more particular findings is no different than contending that the standards set by the legislature are too indefinite. There is no merit in such a challenge of the basic statute, sec. 30.12 (2) (a). To state any more particulars or reasons would be no more than entering findings in the form of policy reasons. In our view, this is not necessary where this agency is performing such a legislative function.

We recognize that there is some support for the proposition that an administrative agency, acting in a non-legislative capacity, in making findings should include reasons for its action, beyond ultimate-fact conclusions that are required. The federal government Administrative Procedure Act requires that all decisions shall include a statement of "findings and conclusions, as well as the reasons or basis therefor." [24] A leading authority on administrative law notes that the "Model State APA and most of the state acts make no requirement of a statement of reasons . . . ." [25]

It is true that in the recent case of *Northeast Airlines, Inc., v. Civil Aeronautics Board*,[26] the federal court

[24] 5 USCA, sec. 1007 (b) ; also see *Northeast Airlines, Inc., v. Civil Aeronautics Board* (1st Cir. 1964), 331 Fed. (2d) 579, 586.
[25] 2 Davis, Administrative Law Treatise, p. 476, sec. 16.12.
[26] *Supra*, footnote 24.

of appeals for the first circuit overruled a determination by the civil aeronautics board denying a renewal of an air carrier permit and remanded the cause for further proceedings on the grounds that the reasons given by the board for its denial "were irrelevant or inadequately developed." The court held that "Courts ought not to have to speculate as to the basis for an administrative agency's conclusion." [27] The court stated that "to prevent just such speculation" the United States Administrative Procedure Act provides that all agency decisions shall include not only the appropriate rule, order, sanction, relief or denial thereof, but also findings and conclusions " 'as well as the reasons or *basis* (emphasis added) therefor, upon all the material issues of fact, law, or discretion presented on the record.' " [28] But there is no such explicit provision in the Administrative Procedure Act for Wisconsin. There is no authority requiring findings to be other than those prescribed by sec. 227.13, Stats., and the findings in the instant case meet the requirements of sec. 227.13 in that they are stated in terms of the ultimate-factual determinations that were necessary to support the commission's order. It may be true that the commission's findings were couched in the very words of the statute but what closer adherence to the legislative standards could one expect?

Appellant contends that the questioned findings do not meet the requirements of the *Cointe* and *Clintonville Cases*. *Cointe* [29] was a contract action in which the plaintiff sought recovery for the reasonable value of drilling and constructing a well. Defendant, the church corporation, after a trial was victorious in resisting this claim. The trial court issued a long detailed opinion disposing of the case but entered very limited findings. On review this court considered that the findings were adequate

[27] Id. at page 586.
[28] Ibid.
[29] *Cointe v. Congregation of St. John the Baptist* (1913), 154 Wis. 405, 143 N. W. 180.

to make it clear (1) that there was no binding contract between the plaintiff and defendant, (2) that the pastor and bishop had not acted as agents of the defendant, and (3) that the corporation had not accepted the benefits of plaintiff's work. This resulted in the dismissal of plaintiff's claim. In its controlling statement about what form the findings should take, the court said:

"The *ultimate* facts which a finding should contain are, generally speaking, the *issuable* facts which a pleading should contain (sec. 2646, Stats.), and practically the same as the facts which a special verdict should contain (secs. 2857, 2858, Stats.). In either case the statement of the ultimate fact frequently includes a legal conclusion from evidentiary facts, and in either case it should, generally speaking, be such a fact that, if it were to be successfully denied, the conclusion of liability or nonliability based upon the findings as a whole is untenable." [30]

In our view the findings in paragraphs 5 and 7 meet the requirements of *Cointe*.

*Clintonville Transfer Line v. Public Service Comm.*[31] presented a case in which another PSC determination was questioned. In that case, the PSC proceeding concerned an application by Clintonville Transfer Line for authority to operate as a common motor carrier in a particular area, beyond its existing authority. The commission denied the application, and the circuit court reversed the commission, pointing out that although the commission filed a 10-page opinion, the opinion did not indicate whether the commission had given any consideration to certain points of service actually served by the applicant on its existing authority. The supreme court ruled that the PSC had failed to comply with the requirements of sec. 227.13, Stats., because the PSC had not entered findings of fact although it had set forth its

[30] Id. at page 418.
[31] (1945), 248 Wis. 59, 21 N. W. (2d) 5.

findings as conclusions of law. This is a far cry from the present case where the PSC has filed detailed findings of fact.

We conclude that the findings were not only in proper form but also were supported by substantial evidence in view of the entire record.

Since the function performed by the PSC in processing this permit application was legislative, the ultimate test for the judicial review of its findings was stated by this court in the first *Ashwaubenon Case*, as follows:

". . . when the 'substantial evidence' rule of sec. 227.20 (1) (d), Stats., is applied to a legislative-type decision, the test is whether reasonable minds could arrive at the same conclusion reached by the commission." [32]

Or as stated in *Weyauwega Telephone Co. v. Public Service Comm.*: [33]

"The weighing of these various factors is a policy function which lies peculiarly within the province of the PSC. If there exists any reasonable basis in the evidence for the determination made by the commission, a reviewing court should not disturb it." [34]

Ch. 227 "does not contemplate that the reviewing court make an independent determination of facts." [35] As stated in *Gateway City Transfer Co. v. Public Service Comm.*: [36]

"The court on review is required by statute to give effect to the legislative command that 'upon such review due weight shall be accorded to the experience, technical

[32] *Supra*, footnote 4, at page 131; also *Borden Co. v. McDowell*, *supra*, footnote 4, at page 258.

[33] *Supra*, footnote 4.

[34] Id. at page 556; see also *Secretary of Agriculture v. Central Roig Refining Co.* (1950), 338 U. S. 604, 614, 70 Sup. Ct. 403, 94 L. Ed. 381.

[35] *Milwaukee & Suburban Transport Corp. v. Public Service Comm.*, *supra*, footnote 3, at page 388.

[36] (1948), 253 Wis. 397, 417, 34 N. W. (2d) 238.

competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it.' Sec. 227.20 (2), Stats.

"Whether the granting of the franchise or amendment sought is in the public interest presents a matter for the exercise of legislative discretion by the commission. It cannot be answered by the application of a proposition of law. It is clear therefore that a trial court must have compelling reasons for reversal where the final conclusion of the agency is based upon a determination which is not only highly discretionary but rests upon the agency's finding as to what is necessary and convenient in the public interest, two terms of indefinite and varying content. We concur in the conclusion of the trial court that such reasons are not present in this case. . . ."

The majority of this court stated, in conjunction with its analysis of judicial review of a PSC decision on the establishment of bulkhead lines:

". . . Even though there is a large hurdle confronting one who seeks to upset the order of a commission in performance of its legislative functions, it is preferable to allow such judicial review rather than to bar it entirely." [37]

The cause was remanded to the PSC for further proceedings and findings.

We would conclude that the appellant has not cleared this "hurdle," that the PSC entered findings which are proper in form, are supported by substantial evidence in view of the entire record, evidence from which reasonable minds could have arrived at the same conclusion.

*PSC Action not Arbitrary or Capricious.*

In *Olson v. Rothwell* this court said very recently:

"Arbitrary or capricious action on the part of an administrative agency occurs when it can be said that such action is unreasonable or does not have a rational

---

[37] *Ashwaubenon, second, supra,* footnote 7, at page 47.

basis. *Chicago, M., St. P. & P. R. Co. v. Public Service Comm.* (1954), 267 Wis. 402, 66 N. W. (2d) 351. Arbitrary action is the result of an unconsidered, wilful and irrational choice of conduct and not the result of the 'winnowing and sifting' process." [38]

No issue has been raised concerning the fact of, or the inadequacy of notice or the opportunity to be heard on the part of the appellant and his witnesses. None could be. The record demonstrates beyond any question that the commission acted reasonably with full notice to the appellant and with adequate findings in taking action on his application. Indeed, the commission first launched an inquiry into the fill in early 1964, and after investigation and a full hearing with proper notice and full participation as far as the appellant is concerned, entered an order finding a violation of sec. 30.03, Stats., and directing the appellant to remove the fill. Although the appellant did not challenge that order or seek a rehearing on it, he initiated permit proceedings and the commission, again after sufficient notice and with full opportunity given to the appellant to support his application, fairly determined that the permit should not issue. All of the requirements of fair play, under secs. 227.07–227.13, Stats., were observed. It follows from our discussion that the PSC action was the result of the "winnowing and sifting process" and not "the result of an unconsidered, wilful and irrational choice of conduct." [39]

There are over 9,000 navigable lakes in Wisconsin covering an area of over 54,000 square miles. A little fill here and there may seem to be nothing to become excited about. But one fill, though comparatively inconsequential, may lead to another, and another, and before long a great body of water may be eaten away

[38] (1965), 28 Wis. (2d) 233, 239, 137 N. W. (2d) 86.

[39] *Olson v. Rothwell, supra,* footnote 38, at page 239; see also *Iron River Grade School Dist. v. Bayfield County School Comm.* (1966), 31 Wis. (2d) 7, 17, 142 N. W. (2d) 227.

until it may no longer exist. Our navigable waters are a precious natural heritage; once gone, they disappear forever. Although the legislature has constitutionally permitted some structures and deposits in navigable waters, it permitted them under sec. 30.12 (2) (a), Stats., only if the Public Service Commission found that "such structure does not materially obstruct navigation . . . and is not detrimental to the public interest."

In our opinion the Public Service Commission, in denying appellant's tardy application for a permit, carried out its assigned duty as protector of the overall public interest in maintaining one of Wisconsin's most important natural resources.

*By the Court.*—Judgment affirmed.

BEILFUSS, J. (*dissenting*). I must dissent. The majority concedes that the hearing on an application for a permit under sec. 30.12 (2), Stats., is required; that it is a "contested case;" that the fair-play provisions of ch. 227, must be observed; and that findings of the commission and its action are subject to judicial review. Its opinion, however, characterizes the function of the administrative agency, Public Service Commission, as legislative and apparently reasons that because of this legislative aspect the commission is not strictly held to the adjudicative "fair-play" standards of secs. 227.07 through 227.13.

In support of the opinion that the commission's function is legislative, the majority cites: *Ashwaubenon v. State Highway Comm.* (1962), 17 Wis. (2d) 120, 131, 115 N. W. (2d) 498 (hereinafter *Ashwaubenon, first*); *Ashwaubenon v. Public Service Comm.* (1963), 22 Wis. (2d) 38, 125 N. W. (2d) 647, 126 N. W. (2d) 567 (hereinafter *Ashwaubenon, second*); *State v. Public Service Comm.* (1957), 275 Wis. 112, 117, 81 N. W. (2d)

71; *Nick v. State Highway Comm.* (1961), 13 Wis. (2d) 511, 109 N. W. (2d) 71, 111 N. W. (2d) 95.

These cases, in my belief, must be distinguished. In *Ashwaubenon, second, supra,* the statute under consideration, sec. 30.11, dealt with *municipal* bulkheads established in navigable waters. While the opinion of the court defines the function of the commission as legislative, the statute (sec. 30.11) does not provide for notice and hearing as does sec. 30.12 (2) under consideration herein. The opinion further specifically states, at page 46:

"We think it is clear that this is not a 'contested case.' Sec. 227.01 (2) Stats., defines a contested case as one in which there is a 'hearing required by law.' "

*State v. Public Service Comm., supra,* dealt with a *special* act of the legislature wherein the city of Madison was given authority to make partial fill of a lake for parking and recreational purpose.

In *Nick v. State Highway Comm., supra,* the issue was the right to inverse condemnation by virtue of a designation of controlled-access highway. The court held the right to inverse condemnation did not lie and that plaintiff and her predecessors in title had not pursued or exhausted their administrative remedy in determining the validity of the controlled access order.

In *Ashwaubenon, first, supra,* we were concerned with the relocation of a substantial segment of an arterial highway. We stated therein, at page 127:

"The so-called fair-play provisions of ch. 227 (secs. 227.07–227.13, Stats., inclusive) do not apply to the case at bar because this is not a 'contested case.' Although a legislative-type hearing does not necessarily preclude the matter from being a contested case, we are unable to find a contested case in the matter at hand."

The legislative function, if any, performed by the commission in deciding whether to issue the permit is

slight. The crucial and overwhelming portion of the legislative discretion has been exercised by the legislature itself. By virtue of the provisions of sec. 30.12, Stats., the legislature has directed, in substance, that no structures or deposits can be placed on the bed of any navigable water unless a permit has been granted by the Public Service Commission "pursuant to statute." The legislature then by statute (sec. 30.12 (2)) provided the Public Service Commission could "after notice and hearing" grant a permit to a riparian owner to build or maintain *for his own use* a structure otherwise prohibited, provided such structure "does not materially obstruct navigation or reduce the effective flood flow capacity of a stream and is not detrimental to the public interest." The legislature and not the commission has determined that otherwise prohibited structures can be placed in navigable waters provided they meet certain standards. Whether these conditions or standards are or will be complied with by the applicant is to be determined by the commission after notice and hearing. The commission must, from the evidence before it, determine whether the conditions or standards fixed by the legislature have been met by the applicant, and if they have a permit should issue. The function of the commission is to make this determination by adjudicative process.

"The crucial question is not characterization of the whole proceeding as judicial or nonjudicial [legislative] but the presence or absence of issues of adjudicative facts." Davis, The Requirement of a Trial-Type Hearing, 70 Harvard Law Review (1956), 193, 204.

There can be no doubt that the hearing called for by sec. 30.12 (2), Stats., is a contested case as defined in sec. 227.01 (2), and that the "fair-play" provisions, secs. 227.07 through 227.13, apply to the commission's adjudication.[1]

---

[1] *Ashwaubenon, second, supra; Hall v. Banking Review Board* (1961), 13 Wis. (2d) 359, 108 N. W. (2d) 543.

The majority opinion acknowledges that this is a contested case and then determines that the findings are supported by substantial evidence in view of the entire record and that the findings are not arbitrary or capricious.

The findings of fact and order of the commission, in their entirety, are as follows:

## "Findings of Fact

"The commission finds:

"1. F. C. Hixon owns real property which is adjacent to Plum Lake in Vilas County, described as follows:

"Lot 1 except V141–235 of C. A. Goodyear's Subdivision of part of Government Lots 9 and 10, section 29, township 41 north, range 8 east.

"Plum Lake is navigable in fact.

"2. During June and July of 1958, an excavation was made in the lake at a location adjacent to the Hixon property approximately 200 feet west of the east property line. The material removed from the excavation was placed on the bed of Plum Lake to form an extension of the upland into the lake. Timber piling has been installed along the inside edge of the fill and stone riprap has been placed along the outer or lake side.

"3. The fill is 85 feet wide at the base and is 139 feet in length along the north or lake side. The maximum extension into the lake from the former shoreline is 75 feet. The fill acts as a breakwater for a mooring facility adjacent to the excavated area.

"4. A sand bar exists on the bed of Plum Lake offshore from the applicant's summer home. The purpose of the excavation was to provide access to the deep water of the lake across the sand bar from the applicant's summer home.

"5. The area in Plum Lake occupied by the fill was navigable by small boats. The fill is spoil from the adjacent excavation and is an extension of the upland into the lake.

"6. The Commission on August 27, 1964, issued findings of fact and an order in Docket No. 2–WP–1961, *Investigation by the Commission of Fill on the Bed of Plum Lake, Vilas County, by F. C. Hixon.* A copy of said order was served upon F. C. Hixon and others by mailing a copy of the same to him by United States mail on August 27, 1964. The said order required F. C. Hixon to remove, prior to December 1, 1964 the fill placed on the bed of Plum Lake and provided that unless the Commission was informed within 30 days after the date of the order that the fill would be removed before December 1, 1964, the matter would be submitted to the Attorney General for enforcement as provided in section 30.03, Statutes. No application for rehearing on such order was filed with the Commission, at any time since said order was issued and served upon F. C. Hixon, although more than 20 days have elapsed since said order was issued and served upon him.

"7. The fill as it exists is an unnecessary obstruction to navigation. It is a material obstruction to navigation. It does not allow for the free flow of water thereunder and is detrimental to the public interest on the navigable water involved.

## "Conclusions of Law

"The commission concludes:

"1. That the fill as described is material placed on the bed of Plum Lake and constitutes a violation of section 30.12, Statutes.

"2. That the fill is an obstruction to navigation in Plum Lake and, as such, is a violation of section 30.15, Statutes.

"3. That in accordance with the foregoing findings of fact, it has authority under section 30.03 (4), Statutes, to determine that the fill as located on the bed of Plum Lake is a violation of sections 30.12 and 30.15, Statutes. The order issued August 27, 1964 in Docket No. 2–WP–1961 and served upon F. C. Hixon and others on said day has become final and is not subject to attack in any court.

"Order

"The commission therefore orders:
"That the application herein by F. C. Hixon for a permit to maintain an existing fill as a structure on the bed of Plum Lake be and the same is hereby denied."

This court has explicitly set down the standards by which the Public Service Commission must draw up its findings of fact under sec. 227.13, Stats. In *Clintonville Transfer Line v. Public Service Comm.* (1945), 248 Wis. 59, 81, 21 N. W. (2d) 5, the court said:

"The last sentence of sec. 227.13, Stats., is in legal effect a command to the Public Service Commission to conform to the decision in *Cointe v. Congregation of St. John the Baptist* (1913), 154 Wis. 405, 143 N. W. 180.
. . .
". . . With this decision before it, no agency should have any difficulty in preparing findings of fact which state the ultimate conclusions upon each contested issue of fact and do that without reciting the evidence. It is to be hoped that all administrative agencies will take note of and comply with the provisions of sec. 227.13, Stats."

The *Cointe Case* sets out the basic test in terms of an illustration at page 417:

"In a personal injury action by employee against employer, the evidence may tend to show that the place in which plaintiff worked was dark, that the floor was rough or insecure, that there was a concealed trap door with insufficient hinges or a rotten barrier, and numerous other facts. These facts are all evidentiary. The ultimate fact is that the employee was furnished an unsafe place to work. If such an action were tried by the court, the findings of fact should not contain a recitation of what this witness or that witness testified as to the darkness or the imperfect floor or the concealed trap door, but should contain a finding of the ultimate facts, namely, that the place was an unsafe place to work, by reason

of the fact that it was dark, or the floor rough, or otherwise."

Only findings of fact five and seven are disputed by the appellant. They are, of course, crucial to the controversy:

"5. The area in Plum Lake occupied by the fill was navigable by small boats. The fill is spoil from the adjacent excavation and is an extension of the upland into the lake."

"7. The fill as it exists is an unnecessary obstruction to navigation. It is a material obstruction to navigation. It does not allow for the free flow of water thereunder and is detrimental to the public interest on the navigable water involved."

The statutory standards to be met by the appellant are: (1) The structure does not *materially* obstruct navigation, (2) does not reduce the effective flood flow capacity, and (3) is not detrimental to the public interest.

A careful reading of the record from the two hearings reveals that seven witnesses testified in behalf of the appellant (six more were available to testify but were not permitted to do so upon the ground their testimony would be cumulative). They testified, in substance, that they were familiar with the area and that the sandbar was a hazard to navigation in that motorboats could not cross the bar; that the breakwater (it is in a cove) did not obstruct navigation but in fact improved it, that it did not affect the flow of the water, that the breakwater did not interfere with fishing, that it enhanced the beauty of the lake, and that it was not otherwise detrimental to the public use or enjoyment of the lake. The town board passed a resolution requesting that the commission not order the removal of the breakwater. A petition signed by nearly 100 percent of the residents of the town made a like request.

Two witnesses testified on behalf of the commission. One was Mr. Sayles, an engineer employed by the com-

mission who also conducted the examination and cross-examination of the witnesses on behalf of the commission. Mr. Sayles' testimony is limited to the physical description of the breakwater and the lake. The other witness for the commission was Mr. Bendrick, the resident conservation warden. Mr. Bendrick testified that the sandbar was not navigable with a motorboat but could be crossed in a rowboat. However, the sandbar extends from 250 to 300 feet from the shore. Appellant's witnesses stated that the bar could be crossed by a rowboat up to 50 to 70 feet from the shore and that then the occupant would have to get out and pull the boat. Mr. Bendrick did not dispute this testimony. He also testified walleyes spawned in the area of the sandbar but did not testify the breakwater adversely affected the spawning, in fact he testified that he observed them spawning on the sandbar after the breakwater was constructed. The sandbar can be crossed in the same manner after the construction of the breakwater as before, with the exception of the very limited area occupied by the breakwater. It protrudes no more than 85 feet and is not more than 20 feet wide. A pier for which no permit is needed would constitute the same area of obstruction.[2] The navigable area of the lake has been decreased only a negligible amount, if at all, because the area where the fill was taken has become a part of the lake.

The findings of fact by the commission do not reveal the basic facts by which the commission concluded that the breakwater was a *material* obstruction to navigation nor in what manner or particular it was detrimental to the public interest. The findings of fact do not meet the basic test as set forth in the *Cointe Case, supra.*

In *State ex rel. Ball v. McPhee* (1959), 6 Wis. (2d) 190, 94 N. W. (2d) 711, this court stated, at page 203:

"In the absence of required findings of fact, this court should not grope around in the dark to ascertain if there

[2] See sec. 30.13, Stats.

is evidence which will sustain any of the 28 specifications of charges. This is because we have no way of knowing which of such specifications the board deemed were sustained so as to justify the discharge. Some were not sustained. Other specifications, even if true, would not qualify as either inefficiency or bad behavior, the only two statutory grounds on which a discharge legally could be based."

If the applicant has shown that his structure does not materially obstruct navigation or reduce the effective flood flow capacity of a stream, and that it is not detrimental to the public interest, he is entitled to a permit. From the findings of the commission this court has no way of knowing what basic facts or lack thereof were relied upon by the commission in its conclusions. A mere negative (or positive) recitation of the statutory standards in the language of the statute does not afford a basis for review.

Nor, in my opinion, are the findings of fact supported by substantial evidence.

In *Silverberg v. Industrial Comm.* (1964), 24 Wis. (2d) 144, 154, 155, 128 N. W. (2d) 674, we stated:

"The scope of review of administrative agency findings and the problems in respect thereto have been recently stated in *Copland v. Department of Taxation* (1962), 16 Wis. (2d) 543, 553–555, 114 N. W. (2d) 858.

" 'The majority and dissenting members of this court are in full agreement as to the principles of law governing the scope of judicial review of an agency's findings of fact under the Wisconsin Administrative Procedure Act (ch. 227, Stats.). The controlling statute is sec. 227.20 (1) (d), which authorizes a reviewing court to reverse or modify an agency decision if substantial rights of the aggrieved party have been prejudiced as a result of the administrative findings being *"unsupported by substantial evidence in view of the entire record as submitted."* (Italics supplied.)

" 'Thus, to apply this standard we must first determine what is meant by "substantial evidence." E. Blythe Stason, in an article entitled "Substantial Evidence" in

Administrative Law, 89 University of Pennsylvania Law Review (1941), 1026, 1038, states:

" ' "[T]he term 'substantial evidence' should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside."

" 'This court, in *Gateway City Transfer Co. v. Public Service Comm.* (1948), 253 Wis. 397, 405, 406, 34 N. W. (2d) 238, quoted from *Consolidated Edison Co. v. National L. R. Board* (1938), 305 U. S. 197, 59 Sup. Ct. 206, 83 L. Ed. 126, to the effect that "substantial evidence" is "such relevant evidence as a *reasonable mind* might accept as adequate to support a conclusion." (Emphasis supplied.)

" 'We deem that the test of reasonableness is implicit in the statutory words "substantial evidence." However, in applying this test the crucial question is whether a reviewing court is only to consider the evidence which tends to support the agency's findings, or whether it is also to consider the evidence which controverts, explains, or impeaches the former. Use of the statutory words "in view of the entire record as submitted" strongly suggests that the test of reasonableness is to be applied to the evidence as a whole, not merely to that part which tends to support the agency's findings. This court so interpreted sec. 227.20 (1) (d), Stats., in *Albrent Freight & Storage Co. v. Public Service Comm.* (1953), 263 Wis. 119, 128, 56 N. W. (2d) 846, 58 N. W. (2d) 410, and *Motor Transport Co. v. Public Service Comm.* (1953), 263 Wis. 31, 45, 56 N. W. (2d) 548. See also 4 Davis, Administrative Law Treatise, pp. 129, 130, sec. 29.03.' "

As to whether the findings were arbitrary and capricious, I only note that at the oral argument counsel for the commission was asked: "At any rate, the Public Service Commission did not give much weight to the testimony of witnesses, is that correct?" His answer: "Correct."

I would reverse and remand to the commission to make additional findings, with or without a supplemental hearing, in its discretion.

I am authorized to state that Mr. Justice HALLOWS and Mr. Justice HANLEY join in this dissent.